UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

NATHANAEL HALLMARK,                                          :
                                                            :
                        Plaintiff,                          :    **COMPLAINT**
                                                            :
            -against-                                       :    Case No.:    1:24-cv-715 (MAD/DJS)
                                                            :
FIRST NEW YORK FEDERAL CREDIT UNION,                        :    **JURY TRIAL DEMANDED**
                                                            :
                        Defendant.                          :
------------------------------------------------------------- X

Plaintiff, Nathanael Hallmark, by and through his attorneys, Harding Mazzotti, LLP, hereby files this Complaint against Defendant, First New York Federal Credit Union, to allege upon knowledge concerning his own experience, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This action is brought to remedy the retaliatory, unlawful and wrongful termination of Plaintiff, by the Defendant, following Plaintiff exercising his guaranteed rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.

2.      This action is additionally brought to remedy the unlawful discrimination of Plaintiff by the Defendant based on his disability, under the New York State Executive Law, Human Rights Law ("NYSHRL") § 290, et seq.; and the laws of the State of New York.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over the subject matter of Plaintiff's claims pursuant to 28 U.S.C. § 1331 as his claims arise under the laws of the United States, namely 29 U.S.C. § 2601, et seq.

1

4.      This Court has jurisdiction over both parties and the subject matter of this action pursuant to 28 U.S.C. § 1332(a), and the Defendant is a business in the State of New York. Furthermore, the amount in controversy exceeds $75,000.00 and the Defendant conducted business in and/or committed tortious acts within the State of New York.

5.      Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this judicial district.

## THE PARTIES

6.      That at all times hereinafter mentioned, Plaintiff Nathanael Hallmark ("Mr. Hallmark"), is a resident of Saratoga County, New York.

7.      That at all times hereinafter mentioned, Defendant, First New York Federal Credit Union ("FNY"), is a not-for-profit credit union, duly organized and existing under the laws of the State of New York with a business address of 2 Wall Street, Albany, NY 12205.

## STATEMENT OF FACTS

### Plaintiff's education and employment background

8.      From 2005 up until the date of Plaintiff's unlawful termination, allegedly occurring on May 25, 2022, Mr. Hallmark had been working as a financial banking professional, with a total of seventeen (17) years' experience, and extensive knowledge as to all levels of the mortgage process.

9.      Plaintiff attended Adirondack Community College in Queensbury, New York, from 2002 to 2004, for Business Administration. Thereafter he attended University at Albany, SUNY, in Albany, New York, from 2005 to 2006 for Political Theory.

10.     Plaintiff was employed with American Federal Savings Bank as a Senior National Mortgage Loan Officer and Marketing Data Analyst from 2005 to 2009.

11.     From 2009 to 2012, Plaintiff worked for SunTrust Mortgage as a Loss Mitigation Specialist/Negotiator, where he helped thousands of homeowners by reorganizing the loss mitigation process while navigating the housing crisis.

12.     In 2012, Plaintiff was a Loss Mitigation Officer for Virginia Housing Development Authority, where he was responsible for debt forgiveness of hundreds of thousands of dollars for military veterans in the state of Virginia.

13.     Between 2013 and 2014, Plaintiff was a Senior Loan Officer and Project Manager at Great Plains National Bank.

14.     Plaintiff worked for Glens Falls National Bank & Trust Company from 2016 to 2017, after which time he attended SUNY Adirondack in Queensbury, New York, enrolled in a Marketing Certification, from 2017 to 2018.

15.     After gaining his Marketing Certification, Plaintiff went to work for Prosper First Capital Corporation from 2019 to 2020, as a Marketing Development Manager.

**Plaintiff's employment with FNY**

16.     On or about May 12, 2021, Mr. Hallmark received a job offer from FNY for the position of Conventional Mortgage Underwriter, and commenced employment on May 17, 2021.

17.     At all times relevant, Plaintiff reported to work at Defendant's 2 Wall Street, Albany, New York, branch, which is located within seventy-five (75) miles of Defendant's ten (10) other branches, where Defendant employed more than fifty (50) employees. As such, Defendant was an employer as defined under the FMLA and NYSHRL.

18.     At all times relevant, Plaintiff was a qualified employee and exceeded expectations in his job performance. Mr. Hallmark was an asset to FNY right from the beginning of his employment, as illustrated by his 90-day employee review dated August 26, 2021. The review

notably states that Mr. Hallmark's "knowledge in conventional lending and understanding of configuring an efficient workflow have been outstanding".

19.     In or about November 2021, Defendant's only branch loan officer quit, and the branch's sole loan processor was reassigned to Defendant's commercial division. Mr. Hallmark was assigned the duties and responsibilities of both positions, in addition to the duties and responsibilities he already had as an Underwriter.

20.     Plaintiff's supervising manager, Director of Conventional Lending Kevin Bailey ("Mr. Bailey"), supervised the remaining Loan Officer processes along with the Loan Closing Processor. However, the Loan Closing Processor was subsequently promoted to another position.

21.     Plaintiff subsequently was assigned the duties and responsibilities of the Loan Closing Processor, in addition to the duties and responsibilities he already had as an Underwriter, and in addition to the Loan Officer and Loan Processor duties and responsibilities he had acquired.

22.     On or around December 2, 2021, Mr. Hallmark's received his 6-month employee review which further evidenced the hard work and dedication he had exerted since the beginning of his employment with FNY. The review specifically states "Nate is motivated, knowledgeable, and works well with his coworkers. He is willing to pitch in to help with any situation and is always looking for ways to improve our mortgage program. He works hard to make the process easy for our members and consistently delivers a high level of service".

23.     While Mr. Hallmark was assigned numerous additional roles and responsibilities over the course of his employment with Defendant, his title and salary remained the same.

24.     Mr. Hallmark had asked Defendant to consider giving him a raise, or at least additional compensation, since they were only paying him to fill one (1) position yet requiring him to cover three (3) additional positions. *Defendant refused to compensate Plaintiff for any of the*

*additional work he was doing. Instead, Defendant instructed Plaintiff to "come into work earlier",*
*and "work more".*

25.     On February 2, 2022, Assistant VP of Human Resources Terri Clasen ("Ms. Clasen") distributed a company-wide email advising that Mr. Bailey resigned from his position of Director of Conventional Lending, effective February 11, 2022, and that they were accepting internal applications for the position.

26.     Mr. Bailey had encouraged Plaintiff to apply for the position of Director of Conventional Lending, as he was knowledgeable, and more than qualified. As such, Mr. Hallmark promptly submitted his internal application to Ms. Clasen on February 3, 2022, and sent an email to the Vice President of Lending Clifford Carigan ("Mr. Carigan"), expressing his interest in the position and outlining all of the reasons as to why he would be a good candidate.

27.     Mr. Carigan acknowledged Plaintiff's application for the position by telling him that he was not going to hire him to fill the soon-to-be vacant position because he did not have prior experience in a senior managerial role.

28.     While Defendant would not officially hire Plaintiff to fill Mr. Bailey's position, they opportunistically assigned Plaintiff his duties and responsibilities, which included the remaining Loan Officer duties and responsibilities Mr. Bailey had been handling, along with loan servicing administrative functions and duties including investor relations, operations, and third-party systems management, as well as closing attorney management and branch/department mortgage communications.

29.     All of these newly assigned duties and responsibilities Plaintiff was assigned to handle were in addition to the numerous duties and responsibilities that Mr. Hallmark was previously assigned and still maintaining.

30.     On February 11, 2022, Plaintiff received a Delegation of Authority, signed by Mr. Carigan and Mr. Bailey, which transferred his authority to Plaintiff, authorizing him to conduct transactions under FNY's Mortgage Asset Program ("MAP").

31.     As of February 11, 2022, Mr. Hallmark was handling the duties and responsibilities of an Underwriter, Loan Processor, Loan Officer, Loan Closing Processor, and Director of Conventional Lending. Mr. Carigan became Plaintiff's direct supervisor and oversaw the department after Mr. Bailey resigned.

32.     While Mr. Carigan oversaw the lending department, he did not have the knowledge to complete the day-to-day tasks, such as filling out a mortgage application. As such, he asked Plaintiff a lot of questions about processes he did not understand, and Plaintiff taught him everything that he needed to learn. Mr. Carigan heavily relied on Mr. Hallmark, and he was never written up, or put on a performance improvement plan of any kind.

33.     In or around mid-March 2022, after Plaintiff had been handling the job duties and responsibilities of the Director of Conventional Lending for a month and a half, he followed up with Mr. Carigan as to whether he would consider officially hiring him for the position, as Defendant had still not hired a replacement for Mr. Bailey at that point.

34.     Mr. Carigan responded to Plaintiff by stating that they were looking to "hire someone from the outside", however Plaintiff was still expected to handle the job duties and responsibilities until they found someone.

35.     Clearly Mr. Carigan's refusal to hire Plaintiff for the position he had been handling for a month and a half was not because he was allegedly "underqualified", as Plaintiff's performance during this time spoke volumes as to his qualifications for the position.

36.     In fact, in the first month and a half that Plaintiff was handling Mr. Bailey's job duties and responsibilities, Plaintiff successfully finalized the implementation of a new and

improved digital process. This new "green" process increased production, management capabilities, and safeguards for auditing and compliance. It also accelerated the loan process resulting in 50% faster closing times.

37.     Between late March and April of 2022, Mr. Carigan subsequently announced that he hired a new Director of Conventional Lending. Upon information and belief, the individual he hired was severely underqualified, and did not have qualified work experience. This individual ultimately never showed up for their first day of work, and Plaintiff was required to continue handling the duties of the Director of Conventional Lending.

38.     In or around April 2022, FNY successfully hired a new Director of Conventional Lending, however he also did not have any qualified work experience, and so Plaintiff was required to train him for the position that Mr. Carigan told him he was not qualified for, which he had been filling for several months.

**Plaintiff's disability related hospitalizations**

39.     Between the date the Delegation of Authority was effective on February 11, 2022, to the time he was wrongfully terminated, Plaintiff was admitted to the hospital several times, due to complications of diabetes, which were exacerbated by the stress he was under due to his job.

40.     The first time Plaintiff was admitted to the hospital was on March 19, 2022.

41.     The second time Plaintiff was admitted to the hospital was on May 6, 2022.

**Plaintiff requests a reasonable accommodation for his disability**

42.     Plaintiff sought a reasonable accommodation in the form of a laptop, to allow him to work remotely when he was unable to work in person at the office, due to his medical condition. However, Mr. Carigan refused to accommodate Plaintiff's reasonable request.

43.     In fact, on May 11, 2022, Plaintiff texted Mr. Carigan stating "if I had a laptop I'd be more use. My diabetes is a disability and I think we should talk about this when I get back", to which Mr. Carigan replied, "As we've discussed, a laptop is not happening so please stop asking".

44.     Mr. Carigan then texted Plaintiff stating, "should you be out Thursday and Friday of this week, you will have used ALL of your available time off".

45.     Defendant's refusal to allow Plaintiff to work remotely, even though many of FNY's employees were allowed to work remotely, including Mr. Carigan, was not because it would have been burdensome to Defendant. In fact, Plaintiff's job positions did not require him to meet with clients on a daily basis, and his job duties could have been completed remotely, when necessary, if Defendant had accommodated his request.

**Plaintiff first requested leave protected under the FMLA on May 18, 2022**

46.     Upon returning to work after his May 6, 2022, hospitalization, Mr. Hallmark requested intermittent FMLA leave from Human Resources on or about May 18, 2022, due to the complications from his diabetes.

47.     From the time Plaintiff first applied for FMLA on May 18, 2022, Plaintiff was an eligible employee under the FMLA, as he had worked for Defendant for twelve (12) months, and he had worked in excess of 1,250 hours within that twelve (12) month period.

48.     At all times relevant, Plaintiff's diabetes was a medical condition that made him eligible for and entitled to leave protected under the FMLA.

49.     Plaintiff informed his direct supervisor, Mr. Carigan, that he had requested intermittent FMLA leave from Human Resources due to his serious health condition.

50.     Mr. Hallmark's intermittent FMLA application was approved by HR on or about May 18, 2022.

**Defendant's discrimination and retaliation against Plaintiff**

51.     The fact that Plaintiff requested leave protected under the FMLA due to his disability, after Mr. Carigan told him he used all his available time off, caused Mr. Carigan to become increasingly hostile toward Plaintiff.

52.     Upon information and belief, after Plaintiff advised Mr. Carigan that he requested leave protected under the FMLA, Mr. Carigan began phishing through Plaintiff's emails, and had IT blind copy him on every single email Plaintiff sent or received. Mr. Carigan would send emails or reply to emails that he was not originally on, which made the IT action apparent.

53.     Despite Plaintiff's serious health issues, significant stress, and the hostile work environment he was enduring, he continued to excel in all his positions at FNY.

54.     On May 17, 2022, the CEO of a local company, and 40-year member of FNY, sent a letter of recognition to FNY's CEO, Lucy Halstead, which stated "Nathanael returned all my calls promptly, even during weekends which I've never experienced before. His passion for providing outstanding customer service was impressive to me, and truly appreciated".

55.     On May 25, 2022, Plaintiff was in his office in a private meeting with the Assistant Vice President of Lending Operations, Gloria Friello, when Mr. Carigan barged through the office door which had been closed.

56.     Immediately following the aforementioned incident, Mr. Carigan called Plaintiff into his office, at which point Mr. Carigan reprimanded him due to allegedly receiving electronic correspondence from a customer, with a complaint about her purchase mortgage transaction.

57.     Plaintiff returned to his office after being yelled at by Mr. Carigan and he called Human Resources Manager Ann Ladd ("Ms. Ladd"), and informed her of what had just occurred, and questioned as to whether Mr. Carigan's actions were in line with the policies and procedures of FNY.

9

58.    Ms. Ladd assured Plaintiff that his job was secure, as he was not subject to any disciplinary actions that HR was aware of, and she further stated that without proper disciplinary actions, Mr. Carigan did not have the authorization to suspend or fire him.

59.    Following Plaintiff's phone call with Ms. Ladd and in connection with all of the increased work volume and stress over the prior weeks, Plaintiff suffered a panic attack and called 911 for medical assistance. Shortly thereafter, Plaintiff was taken by ambulance to the hospital, where he was medically diagnosed with acute stress, stemming from his encounter with Mr. Carigan earlier that day.

60.    In or around the afternoon of May 25, 2022, Plaintiff emailed Ms. Clasen to notify her that he was going to utilize his protected leave under the FMLA, pursuant to HR's approval of May 18, 2022.

61.    At about 2:30 p.m. on May 25, 2022, Plaintiff received a voicemail from Ms. Clasen advising that his FMLA was approved, specifically stating "I will definitely put you out for the FMLA" "get yourself well and we will pay you for the rest of the week and expect to see you after the holiday, on Tuesday [May 31, 2022]". This recorded message is in the possession of the Plaintiff.

**Plaintiff requested leave protected under the FMLA on May 26, 2022**

62.    On May 25, 2022, Plaintiff filed for Workers' Compensation, as the medical staff at the hospital told him he would likely be eligible to do so, and that they would start the billing process under Workers' Compensation.

63.    On May 26, 2022, Plaintiff requested FMLA leave due to "demonstrating significant panic symptoms requiring therapeutic intervention and a referral for medication management". Plaintiff's provider at Hudson Headwaters Healthcare Network faxed the FMLA request directly to FNY.

10

64.     At all times relevant, Plaintiff's panic disorder requiring therapeutic intervention made him eligible for and entitled him to protected leave under the FMLA.

65.     On or around the morning of May 26, 2022, Plaintiff reached out FNY's Facilities Manager, Tyrone Woodard ("Mr. Woodard"), to coordinate picking up his plants from the office for an extended period due to his FMLA leave.

66.     Mr. Woodard advised Plaintiff that he had received instructions from CEO Lucy Halstead to take Plaintiff's belongings from his office and arrange to meet him off company property. As such, at about 1:30 p.m. on May 26, 2022, Plaintiff met Mr. Woodard off company property, in Saratoga Springs, to retrieve his belongings.

67.     Plaintiff was given more than his plants, however, Plaintiff assumed Defendant gave him additional items from his office since they were planning to relocate his office in June of 2022, and assumed Defendant did not want Plaintiff's things moved around during his protected leave under the FMLA.

68.     The following day, May 27, 2022, Plaintiff became aware of a company-wide email that Ms. Clasen sent stating Plaintiff had resigned.  A FNY colleague told Plaintiff that they were "sorry to hear that [he] left".   According to the Plaintiff's colleague, Ms. Clasen sent a company-wide email on May 26, 2022, at 3:30 p.m. stating that Plaintiff had resigned, that his office was cleared out, and that he was forced to get his things off company property.

69.     On May 27, 2022, at 2:17 p.m., Plaintiff sent an email to Ms. Ladd, attaching his May 26, 2022, FMLA form, which was faxed to FNY the day prior, as mentioned above. Plaintiff further clarified in his email to Ms. Ladd that he had no intention of resigning from his position, and at no point did he agree, imply, or suggest that he was ending his employment.", and asked that the company email sent the day prior by Ms. Clasen be immediately retracted and corrected.

70.     Also in his May 27, 2022, email to Ms. Ladd, Plaintiff requested that Defendant provide him with a copy of Plaintiff's employee reviews as of May 25, 2022, along with any other records of write-ups, complaints, positive or negative recommendations from members, and any other relevant employee records within thirty (30) days. However, Plaintiff never received a response to his email from Ms. Ladd.

71.     On June 1, 2022, at 10:30 a.m., Plaintiff received an email from Ms. Clasen enclosing their FMLA Designation Notice dated May 31, 2022, which confirmed that his FMLA application submitted on May 26, 2022, had been approved as of May 27, 2022, which officially put Mr. Hallmark out on leave, protected under the FMLA.

**Defendant unlawfully terminates Plaintiff**

72.     On June 12, 2022, while Plaintiff was out on leave protected under FMLA he received a letter in the mail from Ms. Clasen dated May 31, 2022, advising that his employment is terminated effective May 30, 2022, with no explanation or reason given.

73.     Shortly after receiving the termination letter, Mr. Hallmark received notification from Workers' Compensation that his claim was being controverted by Defendant. As such, Mr. Hallmark retained an attorney to assist him in fighting the Workers' Compensation claim, which ultimately resulted in a Hearing on February 8, 2023.

74.     On June 28, 2022, Mr. Hallmark received an email from Ms. Clasen, with an attachment of electronic correspondence from FNY. The attached letter was backdated to May 25, 2022, and it stated "this letter is to inform you that effective 5/30/2022, your employment with First New York FCU will be terminated due to performance related issues".

75.     Plaintiff was utterly confused as Defendant had previously acknowledged and approved his May 18, 2022, FMLA request. Ms. Clasen again acknowledged and approved

Plaintiff's May 18, 2022, FMLA request when she called and left him a voicemail on May 25, 2022, stating that she would put him out on FMLA.

76.    Defendant had also previously acknowledged and approved Plaintiff's May 26, 2022, request to take leave protected under FMLA. Plaintiff received an email from Ms. Clasen on June 1, 2022, enclosing Defendant's FMLA Designation Notice dated May 31, 2022, which confirmed that his FMLA application submitted on May 26, 2022, had been approved as of May 27, 2022.

77.    Additionally, Defendant's records will reflect that, during his employment with FNY, Mr. Hallmark did not have any "performance related issues". Rather, Plaintiff had an excellent performance history, and his performance reviews were always above par.

78.    Despite Defendant's attempts to make it appear as though they terminated Plaintiff on May 25, 2022, by way of sending a back-dated letter, Defendant's records will reflect that the decision to terminate Plaintiff was made *after* he had requested leave protected under the FMLA, was approved for FMLA leave by HR, and started his protected FMLA leave.

79.    As such, it is evident that the unlawful termination was in direct retaliation of Plaintiff exercising his right to request and utilize leave as protected under the FMLA.

80.    Further, the voicemail that Plaintiff received from HR Ms. Clasen on May 25, 2022, serves as confirmation that Defendant did not terminate Plaintiff on May 25, 2022, effective May 30, 2022. Ms. Clasen specifically stated in her May 25, 2022, voicemail, "I will definitely put you out for the FMLA" "get yourself well and we will pay you for the rest of the week and expect to see you after the holiday, on Tuesday [May 31, 2022]".

81.    While Plaintiff indeed received a voicemail from Ms. Clasen on May 25, 2022, Ms. Clasen testified at the February 8, 2023, Workers' Compensation Hearing, and falsely stated that

she "did not leave a voicemail". Ms. Clasen further testified that Plaintiff's alleged termination "was highly unusual" and "not typical circumstance".

82.     The testimony by Ms. Clasen raises a strong suspicion that she was instructed by Defendant to make it appear as though they terminated Mr. Hallmark on May 25, 2022, in an attempt to hide the fact that he was unlawfully discriminated against, retaliated against, and terminated, all for having a disability, and for filing for FMLA.

## AS AND FOR A FIRST CAUSE OF ACTION
### Interference with Exercising Rights under the Family Medical Leave Act
### in violation of 29 U.S.C. § 2615(a)(1)

83.     Plaintiff repeats, realleges and incorporates by reference each and every allegation, in each and every aforementioned paragraph, as if fully set forth herein.

84.     At all times relevant, Plaintiff reported to work at Defendant's 2 Wall Street, Albany, New York, branch, which is located within seventy-five (75) miles of Defendant's ten (10) other branches, where Defendant employed more than fifty (50) employees.

85.     As such, at all times relevant, the Defendant was an employer as defined under the FMLA.

86.     At all times relevant, from the time Plaintiff first applied for FMLA on May 18, 2022, Plaintiff was an eligible employee under the FMLA, as he had worked for Defendant for twelve (12) months, and he had worked in excess of 1,250 hours within that twelve (12) month period.

87.     At all times relevant, Plaintiff was a qualified employee and exceeded expectations in his job performance.

88.     At all times relevant, Plaintiff's serious health condition surrounding his diabetes complications made him eligible for and entitled him to protected leave under the FMLA.

89.     Plaintiff sought to exercise his rights under the FMLA, including by requesting and utilizing a protected leave under the FMLA. Plaintiff submitted his FMLA application relating to his diabetes complications to Defendant on May 18, 2022, which was then approved by HR on May 18, 2022.

90.     At all times relevant, Plaintiff's serious health condition surrounding his significant panic symptoms requiring therapeutic intervention made him eligible for and entitled him to protected leave under the FMLA.

91.     Plaintiff sought to exercise his rights under the FMLA, including by requesting and utilizing leave as protected under the FMLA. Plaintiff submitted his FMLA application relating to his significant panic symptoms to Defendant on May 26, 2022, which was then approved by HR as of May 27, 2022.

92.     Defendant interfered with, restrained, and/or denied the exercise of, or the attempted exercise of Mr. Hallmark's right to leave under the FMLA, including, but not limited to, by terminating him while he was out on leave protected under the FMLA, and by falsifying documentation to make it appear as though he was terminated before he had started the leave that HR had notified him was approved.

93.     The actions of the Defendants, including their violations of the FMLA, were taken willfully and in bad faith.

94.     As a direct result of Defendant's violation of the FMLA, Mr. Hallmark has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain, suffering, and emotional damages.

95.     Mr. Hallmark seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including but not limited to, future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), diminished earning capacity, liquidated damages, damage to his reputation, damage to his career path, interest, attorneys' fees and costs.

### AS AND FOR A SECOND CAUSE OF ACTION
**Retaliation in Violation of the Family Medical Leave Act**
**29  U.S.C. § 2615(a)(2)**

96.     Plaintiff repeats, realleges and incorporates by reference each and every allegation, in each and every aforementioned paragraph, as if fully set forth herein.

97.     At all times relevant, Plaintiff reported to work at Defendant's 2 Wall Street, Albany, New York, branch, which is located within seventy-five (75) miles of Defendant's ten (10) other branches, where Defendant employed more than fifty (50) employees.

98.     As such, at all times relevant, the Defendant was an employer as defined under the FMLA.

99.     At all times relevant, from the time Plaintiff first applied for FMLA on May 18, 2022, Plaintiff was an eligible employee under the FMLA, as he had worked for Defendant for twelve (12) months, and he had worked in excess of 1,250 hours within that twelve (12) month period.

100.     At all times relevant, Plaintiff was a qualified employee and exceeded expectations in his job performance.

101.     At all times relevant, Plaintiff's serious health condition surrounding his diabetes complications made him eligible for and entitled him to protected leave under the FMLA.

102.     Plaintiff sought to exercise his rights under the FMLA, including by requesting and utilizing a protected leave under the FMLA. Plaintiff submitted his FMLA application relating to his diabetes complications to Defendant on May 18, 2022, which was then approved by HR on May 18, 2022.

103.    At all times relevant, Plaintiff's serious health condition surrounding his significant panic symptoms requiring therapeutic intervention made him eligible for and entitled him to protected leave under the FMLA.

104.    Plaintiff sought to exercise his rights under the FMLA, including by requesting and utilizing leave as protected under the FMLA. Plaintiff submitted his FMLA application relating to his significant panic symptoms to Defendant on May 26, 2022, which was then approved by HR as of May 27, 2022.

105.    Defendant retaliated against and/or discriminated against Mr. Hallmark for engaging in actions protected under the FMLA by subjecting Mr. Hallmark to adverse actions, including, but not limited to, subjecting him to a harassing and otherwise hostile work environment, by terminating him while he was out on leave protected under the FMLA, and by falsifying documentation to make it appear as though he was terminated before he had started the leave that HR had notified him was approved.

106.    The actions of the Defendant, including their retaliation in violation of the FMLA, were taken willfully and in bad faith.

107.    As a direct result of Defendant's retaliation in violation of the FMLA, Mr. Hallmark has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain, suffering, and emotional damages.

108.    Mr. Hallmark seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other nonpecuniary losses), diminished earning capacity, liquidated damages, damage to his reputation, damage to his career path, interest, attorneys' fees and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
**Defendant Discriminated against Plaintiff because of his Disability in Violation of
The New York State Human Rights Law § 296**

109.    Plaintiff repeats, realleges and incorporates by reference each and every allegation, in each and every aforementioned paragraph, as if fully set forth herein.

110.    At all times relevant, Plaintiff was an employee as defined under the NYSHRL.

111.    At all times relevant, the Defendant was an employer as defined under NYSHRL.

112.    At all times relevant, Plaintiff had a disability due to his diabetes.

113.    By its actions detailed above, Defendant unlawfully discriminated against Plaintiff because of his disability in violation of the New York State Human Rights Law.

114.    By reason of the foregoing, Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorneys' fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
**Failure to Provide Reasonable Accommodation for Disability in Violation of
The New York State Human Rights Law § 296(3)**

115.    Plaintiff repeats, realleges and incorporates by reference each and every allegation, in each and every aforementioned paragraph, as if fully set forth herein.

116.    At all times relevant, Plaintiff was an employee as defined under the NYSHRL.

117.    At all times relevant, the Defendant was an employer as defined under NYSHRL.

118.    At all times relevant, Plaintiff had a disability due to his diabetes.

119.    By its actions detailed above, Defendant unlawfully discriminated against Plaintiff because of his disability in violation of the New York State Human Rights Law.

120.    By its actions detailed above, Defendant unlawfully failed to engage Plaintiff in an interactive process regarding reasonable accommodations for his diabetes, in violation of the New York State Human Rights Law.

121.    By its actions detailed above, Defendant unlawfully refused to provide Plaintiff with a reasonable accommodation, which he had requested in the form of a laptop, which would have allowed him to work remotely when his disability caused him to have to miss work.

122.    By its actions detailed above, Defendant unlawfully told Plaintiff to "stop asking" for a reasonable accommodation, which he had requested in the form of a laptop, which would have allowed him to work remotely when his disability caused him to have to miss work.

123.    Defendant unlawfully failed to accommodate Plaintiff's reasonable request due to his disability in violation of the New York State Human Rights Law.

124.    By reason of the foregoing, Plaintiff is entitled to remedies including but not limited to damages for emotional distress, attorneys' fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully demands judgment in his favor against Defendant as follows:

A.  Declaring that Defendant has engaged in, and enjoining Defendant from continuing to engage in, unlawful employment practices prohibited by Federal and New York State laws;

B.  Awarding Plaintiff compensatory damages for all back and future loss of wages, lost income, benefits, retirement losses, stock benefit losses, pain, suffering, stress, humiliation, mental anguish, emotional harm and personal physical injury and physical sickness, as well as damage to his reputation, damage to his career path, and loss of income stemming therefrom;

C.  Awarding Plaintiff liquidated damages;

D.  Awarding Plaintiff punitive damages;

E.   Awarding Plaintiff attorneys' fees, litigation costs, and expert/consultant fees;

F.   Awarding Plaintiff pre- and post-judgment interest; and

G.   Awarding Plaintiff such other relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury with respect to all issues properly triable by jury.

Dated: May 28, 2024
       Albany, New York

By: _____
KELLY A. MAGNUSON, ESQ.
HARDING MAZZOTTI, LLP
*Attorneys for Plaintiff*
P.O. Box 15141
Albany, New York 12212
Tel.: (518) 862-1200
Email: Kelly.Magnuson@1800law1010.com

TO:   First New York Federal Credit Union
      2 Wall Street
      Albany, NY 12205